

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-2-2000

# United States v. Valentine

Precedential or Non-Precedential:

Docket 00-1425

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"United States v. Valentine" (2000). *2000 Decisions.* Paper 231.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/231

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed November 2, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 00-1425

UNITED STATES OF AMERICA,
        Appellant

v.

LARRY VALENTINE, a/k/a HASSAN DELOA TCH,
a/k/a HASSAN DELOACH, a/k/a SHAWN VALENTINE

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Civil No. 99-cr-00345-1)
District Judge: Honorable Katharine S. Hayden

Argued October 6, 2000

Before: NYGAARD, GREENBERG and COWEN,
Circuit Judges

(Filed: November 2, 2000)

        George S. Leone, Esq.
        Michael F. Buchanan, Esq. (Argued)
        Office of the United States Attorney
        970 Broad Street, Rm. 700
        Newark, NJ 07102

         Counsel for Appellant

Kevin F. Carlucci, Esq. (Argued)
Office of the Federal Public Defender
972 Broad Street
Newark, NJ 07102

Counsel for Appellee

OPINION OF THE COURT

COWEN, Circuit Judge:

After receiving a tip from an infor mant, two officers stopped Larry Valentine on a city str eet late at night and discovered a gun. The gun was subsequently suppressed, however, when the government pr osecuted Valentine for being a felon in possession of a firear m in violation of 18 U.S.C. S 922(g)(1) and (2).

In suppressing the gun, the District Court r easoned that under Florida v. J.L., 529 U.S. 266, 120 S.Ct. 1375 (2000) the informant's tip about Valentine and the surrounding circumstances did not provide reasonable suspicion that Valentine was engaged in crime. The District Court also concluded that Valentine's actions after the officers ordered him to stop should not be considered, notwithstanding the Supreme Court's analysis of seizures under the Fourth Amendment in California v. Hodari D., 499 U.S. 621, 111 S.Ct. 1547 (1991).

We will reverse. We hold that the officers had reasonable suspicion before ordering Valentine to stop. This case is distinguishable from J.L. and our r ecent decision in United States v. Ubiles, 224 F.3d 213 (3d Cir . 2000). We also conclude that the District Court erred in interpreting Hodari D. Valentine's acts after the officers ordered him to stop should have been considered.

I

Around 1:00 a.m. on May 8, 1999, Officers W oodard and Contreras were patrolling near the intersection of Columbia and 18th Avenues in Irvington, New Jersey, an area that the officers described in uncontradicted testimony as "very

2

bad" with "[a] lot of shootings." App. at 63. As the officers approached the intersection, a young black man in his early twenties flagged them down and explained that he had just seen a man with a gun.

The informant said that the gunman was wearing a blue sweat top, blue pants, and a gold chain around his neck. He added that the suspect was dark skinned, had a beard, and was accompanied by a young man. When asked to identify himself, the informant refused, a response that Officer Woodard testified is common, and one that is understandable if the informant feared retribution from the armed man or entanglement with the police. The officers did not question the informant further and immediately went in search of the gunman.

About 50 to 100 feet north of the intersection where the officers had met the informant, Woodard and Contreras saw three men standing in a well-lit parking lot near a chicken restaurant. One of the men matched the informant's description of the armed suspect given moments ago, and another was a young male in his twenties, also as the informant described. The third was an older man who appeared to be in his sixties.

The officers, who were in uniform and in a marked car, stopped and stepped out of their vehicle. The three men in the parking lot reacted by walking away, northwards. Contreras ordered the young male with Valentine to stop, and he obeyed, putting his hands up and walking toward the squad car. But when Woodard told Valentine, who was about ten feet away, to come over and place his hands on the car, Valentine responded, "Who, me?" and charged southwards toward Woodard. As Valentine ran, trying to push aside Woodard's outstretched arms, the officer grabbed his shirt and wrestled him to the ground. During the scuffle, Woodard heard a ting as Valentine's silver, fully-loaded handgun hit the ground. Neither officer had seen the gun before that moment.

We have jurisdiction under 18 U.S.C. S 3731, and conduct plenary review of the District Court's determination of whether the officers had reasonable suspicion to stop and frisk Valentine. Ornelas v. United States, 517 U.S. 690,

3

116 S.Ct. 1657 (1996); United States v. Riddick , 156 F.3d 505, 509 (3d Cir. 1998).

II

Under Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868 (1968) and subsequent cases, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." Illinois v. Wardlaw, 528 U.S. 119, ___, 120 S.Ct. 673, 675 (2000). Reasonable suspicion is "a less demanding standard than pr obable cause and requires a showing considerably less than preponderance of the evidence." 528 U.S. at ___, 120 S.Ct. at 675-76. Elaborating on this point, the Supreme Court has said, "Reasonable suspicion is a less demanding standar d than probable cause not only in the sense that r easonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from infor mation that is less reliable than that required to show probable cause." Alabama v. White, 496 U.S. 325, 330, 110 S.Ct. 2412, 2416 (1990). The question we must address is whether Officers Woodard and Contreras had the "minimal level of objective justification" necessary for a Terry  stop. United States v. Sokolow, 490 U.S. 1, 7, 109 S.Ct. 1581, 1585 (1989). And in evaluating reasonable suspicion, "we must consider `the totality of the circumstances--the whole picture.' " Sokolow, 490 U.S. at 8, 109 S.Ct. at 1585 (quoting United States v. Cortez, 499 U.S. 411, 417, 101 S.Ct. 690, 696 (1981)).

We begin our analysis with the Supreme Court's recent opinion, J.L., the case that prompted the District Court to reconsider its initial denial of Valentine's suppression motion. In J.L. the Supreme Court held that police officers lacked reasonable suspicion to make a T erry stop when an anonymous caller reported that "a young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." Florida v. J.L., 529 U.S. at ___, 120 S.Ct. at 1377. The Supreme Court explained that the precise issue before the Court was "whether the tip pointing to J.L. had [sufficient] indicia of r eliability." 529 U.S. at ___,

4

120 S.Ct. at 1378. Finding the tip unreliable, the Court did not consider under what circumstances a reliable tip that someone was carrying a gun would provide the police with reasonable suspicion. Instead, the Court concluded, "All the police had to go on in this case was the bare report of an unknown, unaccountable informant who neither explained how he knew about the gun nor supplied any basis for believing he had inside information about J.L." 529 U.S. at ___, 120 S.Ct. at 1379.

Discussing the reliability of anonymous tips, the Court explained, "Unlike a tip from a known informant whose reputation can be assessed and who can be held responsible if her allegations turn out to be fabricated, see Adams v. Williams, 407 U.S. 143, 146–147, 92 S.Ct. 1921, 1923–24 (1972), `an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity.' " J.L., 529 U.S. at ___, 120 S.Ct. at 1378 (quoting Alabama v. White, 496 U.S. at 329, 110 S.Ct. at 2415). Nevertheless, even in the context of probable cause, the Court has rejected its earlier, inflexible two-prong test for tips set forth in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509 (1964) and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584 (1969). Under Aguilar and Spinelli, the government could not rely on a tip unless the government could demonstrate both the basis of the informant's knowledge and the informant's reliability or veracity. The Court now uses a flexible standard that assesses the relative value and reliability of an informant's tip in light of the totality of the circumstances. See, e.g., Illinois v. Gates, 462 U.S. 213, 230–35, 103 S.Ct. 2317, 2328–30 (1983); Alabama v. White, 496 U.S. at 329, 110 S.Ct. at 2415.

The informant's tip in our case is different from the telephone call in J.L. First, unlike J.L., the officers in our case knew that the informant was reporting what he had observed moments ago, not what he learned from stale or second-hand sources. At the suppression hearing, Officer Woodard was asked, "Did [the informant] say how long ago that he saw the individual carrying a gun?" Woodard replied, "About--maybe a second ago, two seconds ago." App. at 68. So the officers could expect that the informant had a reasonable basis for his beliefs. The Supreme Court

5

has recognized the greater weight carried by a witness's recent report, such as when "the victim of a street crime seeks immediate police aid and gives a description of the assailant." Adams v. Williams, 407 U.S. at 147, 92 S.Ct. at 1924.

Second, the officers had more reason to believe that the informant was credible than the officers did in J.L., for a tip given face to face is more reliable than an anonymous telephone call. As the Fourth Circuit r ecently explained, when an informant relates information to the police face to face, the officer has an opportunity to assess the informant's credibility and demeanor . United States v. Christmas, 222 F.3d 141, 144 (4th Cir . 2000). And when an informant gives the police information about a neighbor (as in Christmas) or someone nearby (as in our case), the informant is exposed to a risk of retaliation from the person named, making it less likely that the informant will lie. Id. Similarly, as the Fourth Circuit noted, "citizens who personally report crimes to the police ther eby make themselves accountable for lodging false complaints." Id. (citing Illinois v. Gates, 462 U.S. at 233–34, 103 S.Ct. at 2329–30 (1983); Adams v. Williams, 407 U.S. at 146–47, 92 S.Ct. at 1923).

Many cases have recognized the differ ence between in-person informants and anonymous telephone calls. See, e.g., Florida v. J.L., 529 U.S. at ___, 120 S.Ct. at 1381 (Kennedy, J., concurring) ("If an informant places his anonymity at risk, a court can consider this factor in weighing the reliability of the tip. An instance where a tip might be considered anonymous but nevertheless sufficiently reliable to justify a pr oportionate police response may be when an unnamed person driving a car the police officer later describes stops for a moment and, face to face, informs the police that criminal activity is occurring."); Davis v. United States, No. 97–CF–1882, 2000 WL 1358490 (D.C. Sept. 21 2000) (An officer had pr obable cause for a search after an informant who declined to give his name flagged down the officer and told him that a man nearby in a wheelchair was selling crack out of his right shoe.); United States v. Salazar, 945 F .2d 47, 50–51 (2d Cir. 1991) ("[A] face-to-face informant must, as a general

matter, be thought more reliable than an anonymous telephone tipster, for the former runs the greater risk that he may be held accountable if his information proves false."); United States v. Sierra-Her nandez, 581 F.2d 760, 763 (9th Cir. 1978) ("[A]lthough the informant did not identify himself by name, he would have been available for further questioning if the agent had judged the pr ocedure appropriate. Unlike a person who makes an anonymous telephone call, this informant confronted the agent directly."); United States v. Gorin, 564 F.2d 159, 161 (4th Cir. 1977) (per curiam) ("[S]tandar ds of reliability should not prevent appropriate action when a victim of a crime immediately has contacted the police. That same analysis applies [when a witness informs the police in person about a crime].").

Valentine contends that the District Court made a finding that the informant left the area after giving the officers the tip, and therefore this informant could not have been easily held accountable. He also complains that the officers could have questioned the informant further. In response to the latter objection, we are not going to second-guess the officers' decision to pursue the suspect immediately. The officers knew the suspect was still in the vicinity, and had they stalled for more lengthy questioning of the informant, the armed suspect could have escaped detection.

In response to the former objection, we have reviewed the record carefully and conclude that the District Court made no factual finding about what the informant did. Indeed, because no evidence was presented either way on the issue, any factual finding that the informant did leave the area would have been clearly erroneous. We simply do not know what the informant did after the officers left.

What matters for our purposes is not that the officers could guarantee that they could track down the infor mant again. As the Supreme Court has said in cases like Gates, the question is whether the tip should be deemed sufficiently trustworthy in light of the total cir cumstances. And in this case the circumstances support the reliability of the tip: the informant was exposed to r etaliation from Valentine and knew that the officers could quickly confirm or disconfirm the tip; and the officers could assess the

7

informant's credibility as he spoke, knew what the informant looked like, and had some opportunity to find the informant if the tip did not pan out. Fr om the fact that the officers acted, and acted quickly, after r eceiving the tip, a court may deduce that the officers thought the tipster's demeanor, voice, and perhaps a host of other factors supported the reliability of the tip. Cf. Ornelas, 517 U.S. at 699, 116 S.Ct. at 1663 ("[A] police officer views the facts through the lens of his police experience and expertise. The background facts provide a context for the historical facts, and when seen together yield inferences that deserve deference.").

The reliability of a tip, of course, is not all that we must consider in evaluating reasonable suspicion; the content of the tip must also be taken into account, as well as other surrounding circumstances. If we focus on the content of the tip, Valentine can invoke our recent holding that, in some contexts, even if police officers have a r eliable tip saying that someone is carrying a gun, that infor mation alone will not provide enough evidence to support a Terry stop. See United States v. Ubiles, 224 F .3d 213 (3d Cir. 2000).

In Ubiles several officers were overseeing a festival in the Virgin Islands when an elderly man appr oached them and pointed out a man he had seen in the crowd with a gun. We suppressed the gun recover ed from the officers' frisk of the suspect, and explained, "For all the officers knew, even assuming the reliability of the tip that Ubiles possessed a gun, Ubiles was another celebrant lawfully exer cising his right under Virgin Island law to possess a gun in public." Id. at 218.

We also acknowledged, however, that r easonable suspicion does not require that the suspect's acts must always be themselves criminal. In many cases the Supreme Court has found reasonable suspicion based on acts capable of innocent explanation. Most recently, in Wardlaw the Court held that headlong flight from the police in a high-crime area provides reasonable suspicion, despite the fact that flight is not by itself illegal and could have completely lawful and rational explanations. The Court explained:

8

> Even in Terry, the conduct justifying the stop was ambiguous and susceptible of an innocent explanation. The officer observed two individuals pacing back and forth in front of a store, peering into the window and periodically conferring. Terry, 392 U.S., at 5-6, 88 S.Ct. 1868. All of this conduct was by itself lawful, but it also suggested that the individuals were casing the store for a planned robbery. T erry recognized that the officers could detain the individuals to r esolve the ambiguity. Id., at 30, 88 S.Ct. 1868.

Wardlaw, 528 U.S. at ___, 120 S.Ct. at 677.

Despite the obvious danger posed by an armed man in a crowd, we concluded in Ubiles that the tip, standing alone, did not provide reasonable suspicion because nothing in "the defendant's behavior pointed to the pr esence of illegal activity." 224 F.3d at 217. In particular , we said that under the laws of the Virgin Islands, a citizen could lawfully possess a gun during a festival, and there was no reason to think Ubiles's gun was unregistered or had an altered serial number, the two ways we mentioned that the gun possession could have been illegal.

Our case is distinguishable from Ubiles. First, there is the broader context. Valentine was walking around at 1:00 a.m. in a high-crime area known for shootings. While an individual's presence in a high-crime ar ea is not by itself sufficient to warrant a Terry stop, Wardlaw, 528 U.S. at ___, 120 S.Ct. at 676 (citing Brown v. Texas, 443 U.S. 47, 99 S.Ct. 2637 (1979)), "the fact that the stop occurred in a `high crime area' [is] among the r elevant contextual considerations in a Terry analysis." Id. (citing Adams v. Williams, 407 U.S. at 144 and 147-48, 92 S.Ct. at 1922 and 1924). The constellation of likely criminal acts in a high-crime area at 1:00 a.m. goes well beyond simply carrying a gun without registration or with altered serial numbers. Indeed, given the large number of potential crimes and the danger posed by an armed criminal, we think that if the police officers had done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss. People who live in communities torn by gunfire and violence are entitled to be free from fear of victimization and have police investigate

9

before shootings occur. As the Supreme Court said in Wardlaw, when the police learn of potentially suspicious conduct, officers can stop and question the suspects to resolve ambiguity about the suspects' conduct.

Moreover, it is well established that officers are allowed to ask questions of anyone--and gun owners are no exception --without having any evidence creating suspicion. Florida v. Bostick, 501 U.S. 429, 434, 111 S.Ct. 2382, 2386 (1991) ("Since Terry we have held repeatedly that mere police questioning does not constitute a seizure."). Given that the original rationale in Terry for permitting frisks was to safeguard officers while they ask questions, see Terry, 392 U.S. at 23-24, 88 S.Ct. at 1881, a ruling in Valentine's favor would produce inexplicable results. We would be holding that while diligent officers would have questioned Valentine after receiving the tip, the officers were not permitted to frisk him, even though they encountered him late at night in a high-crime area known for shootings, and even though, unlike Terry, the officers had specific, reliable reasons for believing that he was armed. We do not think the Supreme Court's jurisprudence supports such a result.

As the Supreme Court noted in a case much like ours, an officer has "ample reason to fear for his safety" while investigating a person reported to have a concealed weapon at 2:15 in the morning in a high-crime area. Adams v. Williams, 407 U.S. at 147-48, 92 S.Ct. at 1924. See also Terry, 392 U.S. at 23-24, 88 S.Ct. at 1881 ("[E]very year in this country many law enforcement officers are killed in the line of duty, and thousands more are wounded. Virtually all of these deaths and a substantial portion of the injuries are inflicted with guns and knives.").

In evaluating the totality of the circumstances, we must also take into account that Valentine and the two men with him immediately began walking away from the patrol car when it arrived. Walking away from the police hardly amounts to the headlong flight considered in Wardlaw and of course would not give rise to reasonable suspicion by itself, even in a high-crime area, but it is a factor that can be considered in the totality of the circumstances. As the Supreme Court recently said, "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion."

10

Wardlaw, 528 U.S. at ___, 120 S.Ct. at 676. See also United States v. Sokolow, 490 U.S. at 8-9, 109 S.Ct. at 1585-86; United States v. Brignoni-Ponce, 422 U.S. 873, 885, 95 S.Ct. 2574 (1975); Florida v. Rodriguez, 469 U.S. 1, 6, 105 S.Ct. 308, 311 (1984) (per curiam). As the First Cir cuit recently stated in the context of a search of a taxi,"slouching, crouching, or any other arguably evasive movement, when combined with other factors particular to the defendant or his vehicle, can add up to reasonable suspicion." United States v. Woodrum, 202 F.3d 1, 7 (1st Cir. 2000) (citing United States v. Sharpe, 470 U.S. 675, 682 n.3, 105 S.Ct. 1568, 1573 n.3 (1985); United States v. Aldaco , 168 F.3d 148, 152 (5th Cir. 1999)). See also United States v. Brown, 159 F.3d 147 (3d Cir. 1998).

In summary, we conclude that the officers had reasonable suspicion after they received the face-to-face tip, were in a high-crime area at 1:00 a.m., and saw Valentine and his two companions walk away as soon as they noticed the police car.

The government offers another gr ounds for distinguishing this case from Ubiles. Unlike the V irgin Islands, New Jersey not only makes it a crime when a person "knowingly has in his possession any handgun, including any antique handgun, without first having obtained a per mit to carry the same," N.J.S.A. S 2C:39-5(b), but also New Jersey presumes that someone carrying a handgun does not have a permit to possess it until the person establishes otherwise. See N.J.S.A. S 2C:39-2(b). New Jersey also has strict permit requirements and a rigid investigation and approval process that buttress the statutory presumption. See N.J.S.A. S 2C:58-4.

Given the evidence supporting the informant's tip in this case, we need not consider New Jersey's regulatory scheme or determine under what circumstances New Jersey's presumption would provide reasonable suspicion for a Terry stop.

IV

The District Court expressly held that inquiry about reasonable suspicion in this case should be confined to

11

events before Woodard order ed Valentine to stop. Because the District Court reached this issue, we think it is important to explain why that holding was err oneous.

While it is true that the "reasonableness of official suspicion must be measured by what the officers knew before they conducted their search," J.L., 529 U.S. at ___, 120 S.Ct. at 1379, the District Court's analysis did not take into account that there can be no Fourth Amendment violation until a seizure occurs. In Hodari D. the Supreme Court held that for there to be a seizur e, the police must apply physical force to the person being seized or, where force is absent, have the person seized submit to a show of police authority. Hodari D., 499 U.S. at 626–28, 111 S.Ct. at 1550–51; Abraham v. Raso, 183 F.3d 279, 291 (3d Cir. 1999); United States v. Bradley, 196 F .3d 762, 768 (7th Cir. 1999). Thus, if the police make a show of authority and the suspect does not submit, there is no seizur e. Hodari D., 499 U.S. at 626, 111 S.Ct. at 1551; United States v. $32,400 in United States Currency, 82 F .3d 135, 139 (7th Cir. 1992). As the Supreme Court r ecently explained, "Attempted seizures of a person are beyond the scope of the Fourth Amendment." County of Sacramento v. Lewis, 523 U.S. 833, 845 n.7, 118 S.Ct. 1708, 1716 n.7 (1998). Cf. Brower v. Inyo County, 489 U.S. 593, 596–97, 109 S.Ct. 1378, 1381 (1989) (A seizure did not occur during the 20 miles in which a police car, with flashing lights, chased a suspect, and instead only occurred when the suspect's car crashed into a police blockade.).

The facts of Hodari D. illustrate how the concept of a seizure should be applied. When two police officers approached a group of four or five youths gathered around a car, the group immediately dispersed, prompting one officer to pursue Hodari, the respondent. By taking a side street, the officer was able to overtake Hodari. Surprised, Hodari tossed away what appeared to be a small rock, moments before the officer tackled him. The central question before the Supreme Court was whether the small rock, which turned out to be crack, should be suppressed.

The Court held that even assuming that the officers did not have reasonable suspicion to stop Hodari when the pursuit began, the crack should not have been suppr essed,

12

for Hodari never complied with the police officers' original show of authority and therefore was not seized when he threw the crack aside.

Other courts have applied Hodari D. and considered a suspect's conduct after he failed to comply with an officer's show of authority. See, e.g., United States v. Johnson, 212 F.3d 1313 (D.C. Cir. 2000); United States v. Smith, 217 F.3d 746 (9th Cir. 2000); United States v. Santamaria-Hernandez, 968 F.2d 980 (9th Cir . 1992).

In Johnson, for example, two officers in an unmarked car were patrolling a high-crime area and pulled into a parking lot where two people were sitting in a parked car with a young woman standing nearby. As the officers appr oached, they saw the woman lean into the passenger's window and hand the defendant, Johnson, an object. As the officers drew closer, the woman walked away, and Johnson made what the officers described as a "shoving down" motion. Thinking Johnson might be armed, one officer drew his gun, advised his partner to do the same, and shouted, "Let me see your hands." 212 F.3d at 1315. But Johnson did not comply and continued to shove down with his ar ms several more times. In response, the officer quickly strode up to the car, reached in, and discover ed crack.

The D.C. Circuit reasoned that if the seizure had taken place when the officers drew their guns and ordered Johnson to show his hands, the court "doubt[ed] very much" whether the officers would have had r easonable suspicion to make a stop. Id. at 1316. Johnson did not comply, however, with the officers' show of authority. "On the contrary, he continued to make `shoving down' motions, gestures that were the very opposite of complying with Fulton's order, and which a reasonable officer could have thought were actually suggestive of hiding (or retrieving) a gun." Id. at 1316-17. Those actions, the court held, gave the officers reasonable suspicion for the search that revealed the crack. Cf. Watkins v. City of Southfield, 221 F.3d 883 (6th Cir. 2000) (A suspect's refusal to comply with an officer's order to stop contributed to the officer's suspicion.); United States v. Moorefield, 111 F.3d 10, 14 (3d Cir. 1997) (When officers stopped the defendant's car, his "furtive hand movements and refusal to obey the officers'

13

orders" helped provide the officers with reasonable suspicion.).

We conclude that as in Johnson and Moorefield, what Valentine did after he failed to comply with the police officers' orders can be considered in evaluating reasonable suspicion. Valentine hopes to distinguish cases like Johnson and Smith by claiming that in fact he had already been seized before he charged towar d Officer Woodard. He says that when Woodard order ed him to come over and place his hands on the car, he momentarily "complied" with the order, stopped, and gave his name. This "compliance," he protests, was enough to trigger a seizur e.

We have reviewed the record carefully and find no evidence in support of Valentine's theory that he even momentarily complied, and some evidence, such as Woodard's police report, appears to rebut the theory. But regardless, no factual determination is necessary, for even if we accept Valentine's version, it would not show that he was seized before he charged Woodard.

Under some circumstances we have held that a defendant was seized despite his subsequent flight. In United States v. Coggins, 986 F.2d 651, 653-54 (3d Cir. 1993) police officers stopped the defendant in a stairwell at an airport and asked him a number of questions, which he answered. After the defendant later asked per mission to go to the bathroom and was allowed to leave, he fled. On appeal we rejected the government's ar gument that the defendant had not been seized.

But Valentine's case is easily distinguishable, for his momentary "compliance" is a far cry fr om the lengthy detention in Coggins. Cf. United States v. Hernandez, 27 F.3d 1403, 1407 (9th Cir. 1994) (The defendant's momentary hesitation and direct eye contact with officer prior to his flight did not constitute a seizur e.); United States v. Sealey, 30 F.3d 7, 10 (1st Cir . 1994) (A defendant was not seized when an officer approached him and called out, "Hey Stephen, what's up?"); United States v. Washington, 12 F.3d 1128, 1132 (D.C. Cir. 1994) (The defendant was not seized when he stopped his car at the curb in response to police commands, but then sped away

14

when the officer approached on foot.). Even if Valentine paused for a few moments and gave his name, he did not submit in any realistic sense to the officers' show of authority, and therefore there was no seizure until Officer Woodard grabbed him.

And once we consider Valentine's actions after Woodard's order, it is clear that we have an independent ground for finding that the officers had reasonable suspicion. For if headlong flight in a high-crime area pr ovides reasonable suspicion under Wardlaw, then charging toward a police officer in a high-crime area also by itself provides reasonable suspicion.

For the foregoing reasons, the District Court's order of April 27, 2000, will be reversed. The case will be remanded to the District Court for further proceedings consistent with this opinion.

A True Copy:
Teste:

      Clerk of the United States Court of Appeals
      for the Third Circuit