**UNITED STATES of America, Plaintiff,**

v.

**Larry E. JOHNSON, Jr., Defendant.**

**No. CR.A. 01CR93 GMS.**

United States District Court, D. Delaware.

Oct. 28, 2002.

Shannon Thee Hanson, U.S. Attorney's Office, Wilmington, DE, for Plaintiff.

James A. Natalie, Jr., Woloshin, Tenenbaum, Lynch, Natalie & Gagne, P.A., Penny Marshall, Federal Public Defender's Office, Wilmington, DE, for Defendant.

### MEMORANDUM AND ORDER

SLEET, District Judge.

## I. INTRODUCTION

On December 11, 2002, the Grand Jury for the District of Delaware indicted Larry E. Johnson, Jr. ("Johnson") on one count of possession of a firearm by a felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2), and one count of possession of a firearm with an obliterated serial number, in violation of 18 U.S.C. §§ 922(k) and 924(a)(1)(B). On July 23, 2002, Johnson filed a motion to suppress both the recovered firearm and comments he allegedly made to detectives on the night of the incident. Specifically, Johnson argues that: (1) the police officers lacked a reasonable suspicion of criminal activity when they seized him; (2) the firearm should be suppressed as a result of its "forced abandonment;" (3) statements he made to police officers which resulted from the alleged illegal seizure were the fruits of the poisonous tree; and (4) alternatively, that he was not *Mirandized* prior to making these statements.

The court held an evidentiary hearing on this motion on September 23, 2002. After considering the testimony elicited during the hearing, and the arguments presented in the parties' briefs on these issues, the court will deny Johnson's motion to suppress in its entirety.

## II. FACTUAL FINDINGS

At the evidentiary hearing, the Government called three Wilmington Police Detective Corporals as its witnesses: George Taylor ("Taylor"), Jeffrey Silvers ("Silvers"), and Brian Ritchie ("Ritchie"). All three of these detectives were also members of the police force's Drug, Organized Crime, and Vice Division ("Vice Division") during the time in question. At the completion of the Government's evidence, Johnson called Ronald Wallace ("Wallace"), who was seated in the front passenger seat of Johnson's car during the relevant time period. The following represents the court's essential findings of fact as required by Rule 12(e) of the Federal Rules of Criminal Procedure.

At approximately 10:50 p.m., on November 12, 2001, Taylor, Silvers, and Ritchie were on duty patrolling in the vicinity of the 600 block of East Fifth Street, Wilmington, Delaware. *See* Transcript of Hearing on Defendant's Motion to Suppress at 7, 21 ("Tr."). The 600 block of East Fifth Street is a short residential city block, with the Bethel Villa Apartment Complex and several other buildings on the south side of the street, and townhomes on the north side. Tr. at 7, 79.

All three of the detectives were familiar with the area they were patrolling. Prior to his assignment to the Vice Division, Taylor, a four-year Wilmington Police Department employee and a seventh-month member of the Vice Division, had been assigned as a Sector Specialist combating, among other things, street-level drug dealing. Tr. at 3–4. Taylor testified that he was aware that the 600 block of East Fifth Street was known for its high drug crime. Tr. at 5. He had also previously made several arrests, predominantly for drug complaints, in and around the area prior to November 12, 2001. Tr. at 5.

Ritchie had also been a detective in the Vice Division for seven months as of No-

vember 12, 2001. Tr. at 78. Prior to that, he had been a Wilmington Police Department patrol officer for two-and-one-half years. During that time, he had been assigned as a Sector Specialist in the area of Wilmington that includes the 600 block of East Fifth Street. Tr. at 78–79. Ritchie testified that the 600 block of East Fifth Street is known for being a high drug crime area. Tr. at 79–80. Prior to November 12, 2001, he had also made arrests, primarily for drug crimes, in and around the 600 block of East Fifth Street. Tr. at 80.

Although November 12, 2001 was Silvers' first day with the Vice Division, he had been employed by the Wilmington Police Department for the four previous years. Tr. at 43–44. Through his prior police work, Silvers spent a good deal of time in the area of Wilmington encompassing the 600 block of East Fifth Street. Tr. at 44. He was also aware that it was an area known for illegal drug sales. Tr. at 44.

The three detectives were riding in a light blue Chevy Lumina. Tr. at 7, 81. Ritchie was driving, Taylor was in the front passenger seat, and Silvers was in the back. Tr. at 6–7, 82. While the police car was unmarked, Taylor testified that it is known as a Wilmington Police Department Vice Division car used for making street arrests Tr. at 7, 22–23. Taylor and Silvers also testified that they were in plain clothes and had Wilmington Police Department badges on chains hanging from their necks. Tr. at 9, 23, 46, 64. The badges were approximately chest high. Tr. at 9, 64.

Ritchie was driving southbound on Spruce Street. Tr. at 8. As the detectives crossed East Fifth Street, Taylor looked into the 600 Block and saw a "large" crowd gathered around a Chevy Lumina and a Dodge Stratus. Tr. at 7, 9. The detectives described the crowd as more than four, and up to seven, people. Tr. at 8, 28. Both the Chevy Lumina and the Dodge Stratus were legally parked next to one another. Tr. at 28.

Taylor testified that, based on his training and experience, he believed a crime might be taking place. Tr. at 8. He then told Ritchie to drive over to the crowd to see what was happening.[1] Tr. at 8, 47. Ritchie drove southbound to Fourth Street, turned right on Fourth, then right again onto Pine Street, and finally turned eastbound on to the 600 Block of East Fifth Street. Tr. at 8. East Fifth Street is a one-way street running westbound. However, because the detectives were hoping to surprise the crowd, they "bucked traffic" by going the wrong way down the one-way street. Tr. at 8–9.

Ritchie stopped the police car in the middle of the street, with its front bumper "about even" with the front bumper of the parked Lumina. Tr. at 61, 84. He left enough room between the two cars so the passengers of both cars could get out and walk around. Tr. at 30, 61. The Dodge Stratus was parked behind the Lumina, and there was sufficient space between the parked cars for at least two to three people to sit on the curb between them. Tr. at 11, 27. Street lights illuminated the block and the area above the parked Lumi-

---

1. Taylor testified that his intention was "to find out exactly what [was] taking place in that block. It's 10:50 at night and we had received complaints from the management of the Bethel Villa Apartment Complex as well as concerned citizens in the area about late night street drug deal activity taking place." Tr. at 29. Although the detectives had not received complaints on November 12, 2001, Taylor had attended a community meeting at the Bethel Villa Apartment Complex regarding citizen complaints of drug activity in and around the apartment complex earlier that fall. Tr. at 4.

na. Tr. at 7, 48, 99. The interior light of the parked Lumina was on, and the headlights of the police car also added light to the scene. Tr. at 48, 70.

Before they got out of the police car, Silvers and Taylor saw two men run from the scene, leaving at least two to three people standing along the sidewalk on the driver's side of the parked Lumina. Tr. at 9, 55, 13, 42. In light of his experience with large groups in high drug areas, Ritchie testified that he thought that the running men were trying to "bait" the officers away from others who might have been holding drugs or guns, or engaging in criminal activity. Tr. at 86–87. As a result, Ritchie shouted to his fellow detectives that they should "stay with this" and not chase the running individuals. Tr. at 87.

As the police car drove up to the crowd, Silvers did not see any of the people on the sidewalk speaking with the occupants of the parked Lumina, nor did he see any unlawful activity. Tr. 67–68, 77. When the police car stopped, Taylor and Silvers exited first. They saw three people in the parked Lumina: (1) the driver, who was later identified as Larry Johnson; (2) a woman sitting on Johnson's lap with her legs outside the open driver's side door, who was later identified as Katrina Senquiz; and (3) a front seat passenger, who was later identified as Ronald Wallace. Tr. at 10, 34, 41, 48–50. Additionally, Taylor could see one person in the Dodge Stratus, who was later identified as Taurian Hammond. Tr. at 11. He was sitting in the front passenger seat. Tr. at 11. Neither Taylor nor Silvers recognized the people in the two parked cars. Tr. at 11, 48.

As Taylor and Silvers got out of the car, Taylor announced that he and his fellow detectives were Wilmington police officers. Tr. 9. He then "ordered everybody to show us their hands." Tr. 9. Ritchie heard Taylor and Silvers identify themselves as Wilmington police officers. Tr. at 86. Wallace was surprised, but he complied with Taylor's request by putting his hands on the dashboard without much hesitation. Tr. at 11. Johnson, however, "seemed to be fumbling around with something.... He definitely was not complying with showing us [his] hands." Tr. at 11–12. As a result, and because of his training and experience with shootings in that area of Wilmington, as well as fear for his safety, Taylor pulled out his gun, took Wallace out of the Lumina, and detained him. Tr. at 12.

As Silvers stepped out of the car, he focused on the defendant because Johnson had a very surprised look on his face. Tr. at 49. Johnson's "eyes got real wide," which led Silvers to believe that something was not right. Tr. at 49, 53. As Taylor approached the parked Lumina, Johnson's hands were out of sight, which caused Silvers to be concerned for Taylor's safety. Tr. at 66. Specifically, Silvers testified:

> I started to go around the front of the Lumina that was parked alongside the street. I started to go around to the front of that, focused in on Mr. Johnson. I heard Detective Taylor saying, "show your hands." At this point, Mr. Johnson pushed the female that was on his lap out of the driver's side door to the sidewalk. His hands then went down low where I could not see them. His hands then went from being down low in front of him around to the side, which appeared to be outside the car, and I heard a metal object drop to the ground at that point.

Tr. at 50. Silvers then testified that "I drew my weapon because I believed, when Detective Taylor said show your hands and I saw [Johnson's] hands go down, through my training and experience, I thought

there would be a weapon or drugs at that point. And so I drew my weapon." Tr. at 50, *see also* Tr. at 75–76 (testifying that "when [Johnson's] hands went down ... towards the bottom of the seat is when I drew my gun.").

Johnson then brought his hands into view, and Silvers took Johnson into custody. Tr. at 51, 72. Johnson made no effort to leave the scene. Tr. at 73. Silvers sat Johnson on the curb behind the Lumina while he kept an eye on the area by the driver's side door because Silvers believed there was a weapon underneath the car. Tr. at 52. After assisting units came to the scene, Silvers recovered a Ruger 9mm model P89 handgun with an obliterated serial number underneath the Lumina in the driver's seat area. Tr. at 52, 69.

With the gun in his hand, Silvers looked over at Johnson, who was still sitting on the curb, no more than six to eight feet away. Tr. at 71. Johnson then told Silvers, "[t]hat is not my gun." Tr. at 53, 71. Silvers set the gun on top of the parked car and made it safe. Tr. at 53, 73.

It took the detectives approximately one minute to secure the scene. Tr. at 101. Once detained, Johnson gave the detectives a fake name, Jamar Brown, with an address in Claymont, Delaware. Tr. at 16, 53. The parties do not dispute that the detectives did not advise Johnson of his *Miranda* rights at any time on November 12, 2001. Tr. at 57, 95.

Johnson, Hammond, and Wallace were taken from the scene to the Wilmington Police Department's Central Booking area, approximately three blocks away. Tr. at 17–18, 92. Taylor and Ritchie escorted the men out of the van in the police department parking lot, through the sallyport, and into the turnkey area of the cellblock. Tr. at 92–93. Taylor testified that he took custody of Hammond, and that Ritchie was in charge of Johnson. Tr. at 18. By contrast, however, Ritchie testified that Taylor had Johnson and that he had Hammond. Tr. at 93, 104.

Regardless of who actually had custody of Johnson, Ritchie testified that, while coming through the sallyport, Johnson made the following statements to him: (1) "I should have put one between your eyes. The next time I will."; (2) "There are more guns out on the street. I'll just go get another one."; and (3) "People need to start using guns on your guys in order to respect us." Ritchie believed that Johnson's comments were directed toward him because Johnson was looking at him as he made the statements. Tr. at 104.

Taylor testified that he heard Johnson essentially tell Ritchie that, "there were a lot of guns on the street and people needed to use these guns to get respect." Tr. at 18–19. Taylor further testified that he did not hear Ritchie say anything to Johnson prior to that statement. Tr. at 39. After Johnson made the first comment, Ritchie asked him, "what did you say?" Tr. at 94–95. Johnson did not respond. Tr. 94–95. Ritchie then asked Johnson, "are you threatening me? That's terroristic threatening. Are you threatening me?" Tr. at 95. After Johnson told Ritchie that he would get another gun, Ritchie and Johnson engaged in "trash talk." Tr. at 95. Specifically, Ritchie "told him [Johnson] to go ahead. [He's] had [his] chance out there. I'm here." Tr. at 95.

Johnson and Ritchie were not engaged in an argument at the time the statements were made, and Taylor did not remember anything Ritchie said that would have elicited Johnson's comments. Tr. at 39. For his part, Ritchie testified that he did not ask Johnson questions about, or initiate conversation regarding, the circumstances of Johnson's arrest. Tr. at 96–96.

At the close of the Government's evidentiary presentation, Johnson called Wallace to testify on his behalf. Wallace stated that he was the passenger in the parked car with Johnson on November 12, 2001. Tr. at 109–110. Wallace explained that he and Johnson were close friends, having known each other for four to five years. Tr. at 110, 128. He had come to the 600 block of East Fifth Street with Johnson in the hope that Johnson could introduce him to a woman. Tr. at 119. Wallace did not know the name of the woman on Johnson's lap, but testified that she was drunk, screaming, and hysterical. Tr. at 118, 122. Wallace testified that he himself was sober. Tr. at 116.

He stated that the three of them had been sitting in the parked car for five to ten minutes, talking and listening to music, when he saw a car, with no lights on, coming down the 600 block of East Fifth Street the wrong way. Tr. at 112, 119. He could not see inside the car. Tr. at 112. He further testified that he heard the words "put your hands up. Don't Move." Tr. at 112. He did not hear the detectives identify themselves as Wilmington Police Officers. Tr. at 127. However, the detectives "didn't have no masks or anything on, so I looked and I seen they could be police." Tr. at 129. Wallace testified that the detectives' guns were drawn as they were getting out of the car, even before he heard the order to put his hands up. Tr. at 112, 128–131.

Wallace's statement that the detectives' guns were drawn as they exited from their car is in direct contravention to Taylor's and Silvers' statements that they drew their weapons in response to Johnson's failure to comply with their request to show his hands. Tr. 11–12, 50, 112, 128, 131. This dispute is not directly relevant to when Johnson was seized. It is, however, relevant to the court's factual determination of whether the detectives' show of authority would have conveyed to a reasonable person that Johnson was being ordered to restrict his movements. Thus, after listening to the testimony from Taylor, Silvers, and Wallace at the suppression hearing, and observing their demeanor, the court concludes that Taylor's and Silvers' account of the incident is credible.

## III. DISCUSSION

### A. The Search and Seizure

The Fourth Amendment prevents "unreasonable searches and seizures." U.S. Const. amend. IV. As a general rule, the Supreme Court has interpreted the Fourth Amendment's reasonableness requirement to mean that seizures and searches must be based on probable cause and executed pursuant to a search warrant. *See e.g., Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). In the present case, Silvers' seizure of Johnson was not made pursuant to a search warrant. As a result, the Government bears the burden of demonstrating that Johnson's seizure was reasonable and falls within one of the exceptions to the warrant requirement. *See United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995).

■ An officer without a warrant "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Robertson*, 305 F.3d 164, (3d Cir.2002) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000)); *see also Terry v. Ohio*, 392 U.S. 1, 22–24, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Under *Terry* and its progeny, reasonable, articulable suspicion of criminal activity has been defined as "specific and articulable facts which, taken together with rational inferences from

those facts, reasonably warrant [the] intrusion." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868.

Courts must consider the "totality of the circumstances" in determining whether such reasonable suspicion existed. *See United States v. Sokolow,* 490 U.S. 1, 8, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989). A law enforcement officer's personal observations and "commonsense judgment and inferences from human behavior" provide the primary basis for his or her reasonable suspicion of criminal activity. *Wardlow,* 528 U.S. at 124, 120 S.Ct. 673. Furthermore, courts must afford considerable deference to those personal observations and conclusions, on the theory that experienced officers can infer criminal activity from conduct that may seem innocuous to a lay person. *United States v. Arvizu,* 534 U.S. 266, 268, 122 S.Ct. 744, 151 L.Ed.2d 740 (2002). The Third Circuit Court of Appeals has described the *Arvizu* standard for reasonable suspicion as "accord[ing] great deference to the officer's knowledge of the nature and nuances of the type of criminal activity that he had observed in his experience, almost to the point of permitting it to be the focal point of the analysis." *United States v. Nelson,* 284 F.3d 472, 482 (3d Cir.2002). For the following reasons, the court concludes that the detectives in the present case had a reasonable and articulable suspicion of criminal activity sufficient to support Johnson's seizure.

■ The court must first determine when the police seized Johnson. In *California v. Hodari D.,* the Supreme Court held that a person is seized for purposes of the Fourth Amendment when he or she submits to the police officers' show of authority. 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991). In that case, as police officers were patrolling a high crime neighborhood in Oakland, California, they came upon four to five youths huddled around a car late at night. *See id.* at 622–623, 111 S.Ct. 1547. When the youths saw the police car approach, they all took flight. *See id.* One officer, Officer Pertoso, followed the defendant Hodari on foot. *See id.* As Officer Pertoso caught up to Hodari, he tossed aside what turned out to be a small rock of cocaine. *See id.* A moment later, Officer Pertoso tackled Hodari and placed him under arrest. *See id.*

Hodari subsequently moved to suppress the rock of cocaine, arguing that the officers did not have sufficient reasonable suspicion to stop him under *Terry v. Ohio.* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). The critical question before the Court was whether Hodari had been "seized" within the meaning of the Fourth Amendment at the time he dropped the drugs. The Supreme Court concluded that Hodari had not been "seized" for Fourth Amendment purposes. Therefore, the motion to suppress was properly denied. *See id.* at 629, 111 S.Ct. 1547.

■ Specifically, the Court held that a "seizure" under the Fourth Amendment requires either (1) physical force applied by the police on the suspect; (2) submission by the suspect to the officers' assertion of authority. *See id.* at 626, 627 n. 3, 111 S.Ct. 1547. A show of authority by the police to which the subject does not yield is insufficient. *See id.* Moreover, if no physical force accompanies the show of authority, and an individual then chooses to ignore the show of authority, there is no seizure until the officer applies physical force or the individual submits to the show of authority. *See id.* at 624–627, 111 S.Ct. 1547.

On the facts of the *Hodari* case then, the Court found that, since Hodari did not comply with the officers' alleged show of authority, he was not "seized" for Fourth Amendment purposes until he was tackled.

*See id.* at 629, 111 S.Ct. 1547.[2] Thus, any action taken by the defendant up to the point of physical contact, or of submission to authority, "can be considered in evaluating reasonable suspicion." *United States v. Valentine,* 232 F.3d 350, 358 (3d Cir.2000). This is so because, under *Hodari,* those actions are necessarily "pre-seizure." *See id.*

The defendant attempts to distinguish *Hodari* by focusing on the fact that Hodari fled the scene, whereas the defendant here remained in the parked Lumina. *See* Def. Brief at 4. In the context of this case, however, Johnson's actions in placing his hands where the detectives could not see them, in complete disregard for the detective's order, is the factual equivalent of Hodari's running away from the police after being told to stop. Johnson's actions in response to the detective's request were not neutral, such as sitting still in the car, which might lead one to believe that he had submitted to the detective's show of authority. Thus, while it is true that Johnson did not run from the scene, it is equally true that his actions were not perceived by the officers as compliant. Indeed, both Taylor and Silvers testified that it was precisely because Johnson failed to show his hands that they drew their weapons.[3] Tr. at 11–12, 50. As the detectives testified, his hands could have been reaching for a weapon, as they suspected, or he could have been attempted to turn the starter of the car to flee. Tr. at 12, 50.

Moreover, the facts of *United States v. Johnson* are quite similar to the situation presently before the court. 212 F.3d 1313 (D.C.Cir.2000) (cited as supporting authority by *United States v. Valentine,* 232 F.3d at 358–359.) The *Valentine* court summarized *Johnson* as follows:

> In *Johnson,* for example, two officers in an unmarked car where patrolling a high-crime area and pulled into a parking lot where two people were sitting in a parked car with a young woman standing nearby. As the officers approached, they saw the woman lean into the passenger's window and hand the defendant, Johnson, an object. As the officers drew closer, the woman walked away, and Johnson made what the officers described as a "shoving down" motion. Thinking Johnson might be armed, one officer drew his gun, advised his partner to do the same, and shouted, "Let me see your hands." 212 F.3d at 1315. But Johnson did not comply and continued to shove down with his arms several more times. In response, the officer quickly strode up to the car, reached in, and discovered crack.

*Valentine,* 232 F.3d at 358–359. On those facts, the District of Columbia Circuit Court reasoned that the "shoving down" motions were gestures that were the very opposite of complying with the order to show his hands. A reasonable officer could have thus thought that the defendant was hiding or retrieving a gun. *See Johnson,* 212 F.3d at 1316–1317. Those actions, the court held, gave the officers reasonable suspicion for the search that revealed the crack. *See id.*

Following the logic of the *Valentine* and *Johnson* courts, the court thus concludes

**2.** Furthermore, the Court found that the cocaine Hodari abandoned while he was running was not the fruit of a seizure. *See id.* at 629, 111 S.Ct. 1547.

**3.** Based on Wallace's testimony at the hearing, Johnson argues that the detectives did not wait to draw their weapons until after they got out of the police car, but instead got out of the car with their guns drawn. Def. Brief at 3. As the court discussed in its Findings of Fact, *supra,* however, the court has determined that the detectives' testimony on this point is credible.

that the facts of the present case fall within the *Hodari* seizure analysis. Here, Johnson did not submit to the detectives' lawful show of authority until after Silvers heard the sound of metal hitting the pavement. Instead of complying with Taylor's general command that he show his hands, Johnson, in fact, reacted in the opposite way by putting his hands down into, and under, the driver's seat where neither Silvers nor Taylor could see them. *See* Tr. at 11–12, 50. Johnson's actions constituted the precise opposite of complying with the detective's request. Thus, for Fourth Amendment purposes, the court may properly consider all the actions taken by Johnson prior to his submission in determining that Silvers had a "reasonable and articulable suspicion" of criminal activity.

■ After considering the "totality of the circumstances," the court concludes that the detectives had a "reasonable and articulable suspicion" supporting their actions. At a relatively late hour of a weekday evening, the detectives saw a crowd of people congregating around two lawfully parked cars at night in an area known for high drug activity. Tr. at 7–9, 25, 27–28; *see also United States v. Edmonds*, 240 F.3d 55, 60 (D.C.Cir.2001) (noting that a neighborhood's reputation as a high-crime area has probative value in determining the reasonable suspicion supporting a *Terry* stop). Both Taylor and Ritchie had conducted drug arrests in the area of the 600 block of East Fifth Street. Tr. at 3–5, 44, 80. Additionally, Taylor and Silvers, the detectives who seized Johnson and Wallace, saw two men flee the scene upon their approach. *See Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (stating that "[h]eadlong

flight—wherever it occurs—is the consummate act of evasion").[4]

Furthermore, as the court discussed above, the "totality of the circumstances" to be considered in determining whether reasonable suspicion existed to support Johnson's seizure also includes all of Johnson's non-compliant conduct after being ordered to show his hands. *See Valentine*, 232 F.3d at 358. In the present case, as Silvers stepped out of the police car, Johnson had a "very surprised look" on his case. Tr. at 49. Because Johnson's eyes got "real wide," Silvers was led to believe that something was not right. Tr. at 49, 53, *see also Wardlow*, 528 U.S. at 124, 120 S.Ct. 673 (holding that "nervous, evasive behavior is a pertinent factor in determining reasonable suspicion.") As Silvers approached, Johnson pushed Senquiz off his lap and out the driver's side door to the sidewalk. Tr. at 50. Johnson's hands then went "down low" where Silvers could not see them. Tr. at 50. Taylor described Johnson's behavior as "fumbling around with something," which Taylor thought likely was a gun. Tr. at 12; *see also United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir.1997) (finding that a defendant's "furtive hand movements" and refusal to obey an officer's commands helped provide reasonable suspicion.).

Johnson's hands then went from being "down low" in front of him to around the side of the car. Tr. at 50, 75–86. It was at that point that Silvers heard a metal object drop to the ground. Tr. at 50. Based on his experience, he believed that object to be a gun. Tr. at 50. It was only after these events occurred did Johnson submit to Silvers' show of authority by

---

4. Although Ritchie testified that the men ran into the courtyard as he was coming out of the driver's side door, which was after Taylor and silvers were already out of the patrol car, his testimony on this point is equivocal. Tr.

at 100. Moreover, the precise timing of the two individuals' flight from the area is not essential to this analysis. For present purposes, what is important is that all three detectives saw two men flee from the scene.

bringing his hands into view Tr. at 51, 72. Collectively considering these events, the court concludes that they amounted to reasonable suspicion for Silvers' seizure of Johnson. *See Arvizu,* 534 U.S. at 277, 122 S.Ct. 744.

## B. Forced Abandonment

■ In general, abandoned property may be obtained by the police and used for evidentiary purposes. *See e.g., United States v. Brady,* 842 F.2d 1313, 1315–1316 (D.C.Cir.1988). However, "when abandonment of property is precipitated by an unlawful seizure" or search, that property is the fruit of the officer's unlawful activities and is inadmissible. *United States v. Coggins,* 986 F.2d 651, 653 (3d Cir.1993) (citations omitted). As one commentator noted:

> Numerous courts [prior to the *Hodari* decision] embraced the doctrine of forced abandonment. Under that theory, once the police . . . [make] a show of authority designed to produce a stop, the Fourth Amendment is implicated. If, in response to unjustified police actions, the suspect thereafter abandons the property he or she is carrying, then the property abandoned, be it illegal drugs, stolen goods, or other evidence, normally cannot be used against the accused.

Clancy, *The Supreme Court's Search for a Definition of a Seizure: What is a "Seizure" of a Person Within the Meaning of the Fourth Amendment?* 27 Am.Crim. L.Rev. 619, 648 (1990).

■ It is undisputed that Johnson denied ownership of the gun when Silvers showed it to him. Tr. at 53, 71. He can thus be fairly said to have exhibited the requisite intent to abandon the gun. *See United States v. Veatch,* 674 F.2d 1217, 1221 (9th Cir.1981) (holding that a denial of ownership indicates intent to abandon); *see also United States v. Canady,* 615 F.2d 694, 695–697 (5th Cir.1980). Moreover, as the court discussed above, absent any physical contact with the police or evidence that the defendant yielded to a show of authority, a claim of forced abandonment does not require suppression of evidence the defendant abandoned *prior* to the seizure. *See United States v. Taylor,* 1992 WL 333589, at *5 (E.D.Pa.1992) (citing *Hodari,* 499 U.S. at 625–626, 111 S.Ct. 1547). Even a clearly manifested intent to seize, if the defendant does not submit to it, is not a basis for suppression of evidence abandoned in response. *Hodari,* 499 U.S. at 627–629, 111 S.Ct. 1547.

In the present case, the detectives did not apply physical force to Johnson prior to his abandonment of the gun. Tr. at 51. Furthermore, as the court found above, Johnson did not submit, or in any way yield, to the detectives' show of authority prior to his abandonment of the gun. Tr. at 51, 72–73, 76. Accordingly, as Johnson was not seized for Fourth Amendment purposes at the time that he abandoned the gun, the court will not suppress the gun. *See Hodari,* 499 U.S. at 629, 111 S.Ct. 1547.

## C. Suppression of Statements

Although Johnson was not seized for Fourth Amendment purposes prior to abandoning the gun, Silvers ultimately seized him when he was taken out of the car, placed on the curb, and handcuffed. Tr. at 51, 72. After Johnson was taken into custody, he was transported to the Wilmington Police Department Central Booking area. Tr. at 17–18, 92. Johnson now seeks to suppress the statements he made at the police headquarters because they are fruits of the poisonous tree and because he was not *Mirandized* at the time he made them. *See* Def. Brief at 6–7.

For the following reasons, the court will deny his motion on this ground.

As an initial matter, the court has already concluded that Johnson's seizure comported with the requirements of the Fourth Amendment. Thus, statements made after, and as a result of, his seizure, are not fruits of the poisonous tree. The court will, therefore, turn to Johnson's *Miranda* argument.

■ At the suppression hearing, Ritchie testified that Johnson made several statements to him at the police headquarters. Tr. at 94. Specifically, he testified that Johnson made the following statements: (1) "I should have put one between your eyes. The next time I will."; (2) There are more guns out on the street. "I'll just go get another one."; and (3) "People need to start using guns on you guys in order to respect us." [5] Tr. at 94. The Government concedes that Johnson was not *Mirandized* prior to his making these statements. *See* Government's Brief at 19.

■ It is undisputed that the Government may not use statements in its case-in-chief made as a result of custodial interrogation by law enforcement officers unless the defendant has been advised of, and validly waived, his *Miranda* rights. *See Miranda v. Arizona*, 384 U.S. 436, 444, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In *Rhode Island v. Innis*, the Supreme Court defined interrogation as "express questioning or its functional equivalent." 446 U.S. 291, 300–301, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980). The functional equiv-

alent of interrogation consists of "words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* at 301, 100 S.Ct. 1682. Furthermore, the Government bears the burden of proving that the defendant's statements were voluntarily given. With regard to this burden, the Supreme Court has stated that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary.'" *Colorado v. Connelly*, 479 U.S. 157, 167, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986).

Here, prior to the time that Johnson made his first statement to Ritchie, Ritchie testified that he had not initiated any conversation with the him regarding the circumstances of his arrest. Tr. at 95–96. At the suppression hearing, Ritchie did admit, however, that *after* Johnson said he would get another gun, he and Johnson had engaged in "trash talk." Tr. at 95. Johnson now attempts to characterize this talk as taunting by Ritchie designed to "elicit a response from [Johnson]." *See* Defendant's Brief at 3, 7. It is this alleged behavior that Johnson argues is the functional equivalent of interrogation under *Innis. See id.*

After considering both the testimony from the suppression hearing, and the parties' briefs on this matter, the court concludes that the record does not support an assertion that Ritchie "interrogated" Johnson. Specifically, there is no evidence that Ritchie was talking to, or otherwise inappropriately interacting with, Johnson be-

---

5. Ritchie admitted at the hearing that the phrase, "I'll just go get another one" was not included in Silvers' police report. Tr. at 106. Johnson thus argues that, because this statement was not included in the police report, it is inherently suspect and casts doubt on the reliability of Ritchie's recollection with respect to the other statements. *See* Def. Brief at 3. At the hearing, Ritchie explained that he told Silvers what to write down, but that "[h]e might not have wrote [sic] down every single exact word but he wrote down something similar to it." Tr. at 106. Based on its observations during the hearing, the court concludes that Ritchie's recollections at the hearing are sufficiently credible for purposes of this suppression motion.

fore Johnson made the statements at issue. Tr. at 18–19, 39, 95–96. Thus, the court concludes that Johnson's statements were purely voluntary, "off-the-cuff" comments which were not the product of an interrogation. As a result, they will not be suppressed.

## IV. CONCLUSION

Based on the totality of the circumstances, including Johnson's pre-compliance actions, the court concludes that the detectives had a "reasonable and articulable" suspicion of criminal activity when they seized Johnson. Because Johnson's actions with regard to the gun occurred before he was seized, the court further concludes that there was no forced abandonment. Finally, the court finds that there is no evidence in the record to support an assertion that Johnson's later comments to the detectives were involuntary and the result of an interrogation.

Therefore, IT IS HEREBY ORDERED that:

1. Mr. Johnson's Motion to Suppress (D.I.11–3) is DENIED in its entirety.